UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| CATHERINE MULDOON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 3:25-cv-00347-OAW |
| | ) | |
| SENSITIVE CARE COSMETIC & | ) | **JURY TRIAL** |
| FAMILY DENTISTRY, LLC and | ) | **DEMANDED** |
| ALEXANDER QUINTNER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT AND JURY DEMAND

### PARTIES

1.      The Plaintiff, Catherine Muldoon ("Dr. Muldoon" or the "Plaintiff"), is an adult female resident of the state of Connecticut.

2.      Defendant Sensitive Care Cosmetic & Family Dentistry, LLC (the "Company") is a domestic for-profit corporation doing business in the state of Connecticut.  The Company is incorporated in Connecticut and its principal office is located at 55 Old Gate Ln, Milford, CT 06460.

3.      Defendant Alexander Quintner ("Quintner") (the Company and Quintner, individually and collectively, the "Defendants") is an adult male dentist, the owner of the Company, and a resident of the State of Connecticut.  Upon information and belief, Quintner resides at 106 Charles Street, Fairfield CT 06824.

### JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to Title VII and the ADA. The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

5.      This court has personal jurisdiction over the Company because the Company is a resident of Connecticut, including because it is incorporated in Connecticut and because its principal place of business is in Connecticut.

6.      In addition, this Court has personal jurisdiction over the Company because the Company has engaged in and transacted business in the State of Connecticut, including by managing and/or operating a business in Connecticut and/or by employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem largely from Company's business transactions within the State of Connecticut.  Indeed, the Plaintiff was employed by the Company in the State of Connecticut, was managed and supervised by Company in the State of Connecticut, was discriminated against and harassed by the Company in the State of Connecticut, and was terminated by the Company in the State of Connecticut.

7.      This court has personal jurisdiction over Quintner because Quintner is a resident of Connecticut.

8.      In addition, this Court has personal jurisdiction over Quintner because Quintner has engaged in and transacted business in the State of Connecticut, including by managing and/or operating a business in Connecticut and/or employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem largely from Quintner's business transactions within the State of Connecticut.  Indeed, the Plaintiff was employed by Quintner in the State of Connecticut, was managed and supervised by Quintner in the State of Connecticut, was discriminated against and

harassed by Quintner in the State of Connecticut, and was terminated by Quintner in the State of Connecticut.

## STATEMENT OF FACTS

9.  In 2011, Dr. Muldoon graduated from the University of Pennsylvania and received her Doctor of Dental Medicine.  Dr. Muldoon is a licensed dentist (DMD) properly licensed and authorized to practice as a dentist in the state of Connecticut.

10.  At all relevant times, Dr. Muldoon suffered from attention deficit hyperactivity disorder ("ADHD").  Dr. Muldoon's ADHD was and is a mental impairment that substantially limited on or more of her major life activities, including, but not limited to, planning and concentrating.  Further, Dr. Muldoon's ADHD was and is an impairment which substantially limits one or more of Dr. Muldoon's major bodily functions, including, but not limited to, her neurological functions.

11.  Accordingly, at all relevant times, Dr. Muldoon's ADHD was a disability under Connecticut and Federal law, and, at all relevant times, Dr. Muldoon was a qualified individual with a disability under Connecticut and Federal law.

12.  In 2020, Dr. Muldoon began working within the Company as a consultant, bringing in revenue and earning commission.

13.  At or around this time, Dr. Muldoon moved into Quintner's house due to her need to be in Connecticut to work for the Company.

14.  Although Quintner and Dr. Muldoon were living together, Dr. Muldoon made it clear she was interested in and intended to date other people. Although Quintner seemed to agree, Quintner told Dr. Muldoon he did not want her to bring other men to the house.

15. During this same time, with Quintner's knowledge, Dr. Muldoon also maintained a job as a dentist with another practice.

16. Similarly, on or around November 9, 2020, Dr. Muldoon began her own practice in Dobbs Ferry, New York (with Quintner's knowledge).

17. Shortly after beginning this arrangement, Quintner, who Dr. Muldoon had been seeing casually, told Dr. Muldoon that he was telling people that she was his girlfriend.

18. This claim made Dr. Muldoon exceedingly uncomfortable as she did not consider herself to be his girlfriend, and did not want to be referred to as such.  Indeed, Dr. Muldoon explicitly stated to Quintner that she was not his girlfriend.

19. Upon information and belief, Quintner was also, in a seemingly boastful and demeaning manner, showing co-workers pictures of Dr. Muldoon from her past when she had participated in the Miss USA pageant as Miss Virginia, including pictures of Dr. Muldoon in a bikini bathing suit.

20. This behavior made Dr. Muldoon further uncomfortable, as she was at the Company for a professional relationship in dentistry, not to be shown off by Quintner as some supposed trophy.

21. Indeed, instead of focusing on Dr. Muldoon's work as a dentist, Quinter appeared to be encouraging others in the office to focus in an overly sexualized manner on Dr. Muldoon's past participation in beauty pageants.

22. Notably, Quintner did not show co-workers pictures of any other colleagues, and certainly not in the demeaning sexualized way he showed off pictures of Dr. Muldoon.

23. Despite this sexually harassing behavior, Dr. Muldoon was excelling in generating business for the Company.

24.     For example, within one month, on or around December 3, 2020, Dr. Muldoon sold a $70,000 treatment plan to a patient.

25.     Quintner made it clear that he was impressed with Dr. Muldoon's job performance, her business acumen, and the amount of revenue she was generating for the Company (directly and indirectly).

26.     In or around May 2021, Quintner began speaking with Dr. Muldoon about her practicing dentistry with the Company as an employee.  Quintner indicated that Dr. Muldoon would become a partner and/or joint owner of the Company within the year, but he urged her to start by taking a job as an employee of the Company where Quintner would serve as her direct supervisor.

27.     In or around November 2021, as a result of Quintner's promise to make Dr. Muldoon a partner and co-owner of the Company, Dr. Muldoon closed her Dobbs Ferry practice.

28.     At or around this time and continuing intermittently throughout Dr. Muldoon's employment, Quintner and Dr. Muldoon had multiple discussions about the nature of the proposed partnership and Dr. Muldoon becoming a co-owner.

29.     For example, on at least one occasion, Quintner showed Dr. Muldoon a copy of the partnership buy-in agreement Quintner had executed with his father when he (Quintner) originally bought into the Company, which had originally been his father's company.  As Quintner showed Dr. Muldoon this agreement, Quintner explained Dr. Muldoon and him could handle the partnership in the same way, which involved work performed for the Company counting towards the partnership buy-in amount.

30.     Indeed, Quintner explained that he was currently renegotiating the agreement with his father due to his father's early retirement (requiring the need for Dr. Muldoon), and Dr.

Muldoon explained she expected a better deal given her higher level of experience compared to Quintner both at the time of him making an agreement with his father and that Dr. Muldoon's experience exceeded both Quintner and his father in material ways.

31. Quintner agreed stating that she had to prove that her expertise was valuable by showing with numbers in the form of production in the following year, and explained a valuation was done before and would be done after.

32. Both Quintner and Dr. Muldoon agreed that the increase in valuation would act as sweat equity in the partnership

33. Indeed, at some point around the time of these discussions, Quintner had a valuation of the Company performed that sought to calculate the value of the Company prior to Dr. Muldoon's involvement.

34. Following this valuation, Quintner explained any increases from Dr. Muldoon following the valuation would go towards to Dr. Muldoon's buy-in for the partnership and/or her co-ownership of the Company.

35. Importantly, as part of these discussions, Quintner made it clear the partnership was intended to start one year after Dr. Muldoon began working for Quintner and the Company. Importantly, the percentage was to be based on the percent increase in valuation due to Dr. Muldoon's work and business partnership, until Dr. Muldoon and Quintner were equal co-owners of the Company.

36. In or around the summer of 2021, Dr. Muldoon began working directly for the Company as an employee, as she transitioned out of the practice she formerly worked at.

37. At all relevant times, Dr. Muldoon's performance with the Company was satisfactory.

38. Indeed, in or around June 2021, Dr. Muldoon was presented with a letter of intent, which, in part, stated that "Alexander Quinter intends to love and support Catherine Muldoon. Catherine Muldoon intends to love and support Alexander Quintner."

39. Stunned by this clearly inappropriate contract, Dr. Muldoon again attempted to clarify that any physical relationship she had with Quinter was not connected to their professional relationship.

40. In or around August 2021, Dr. Muldoon officially resigned from her other position in anticipation of working full-time for the Company and with the expectation (fostered by Quintner) that she would soon become a partner in the business.

41. However, in or around September 2021, after Dr. Muldoon officially resigned from her position with her previous employer, it became apparent that Quintner was seeking to use her now full-time employment by the Company as a coercive and exploitive tool to subject Dr. Muldoon to further sexually harassing and controlling behavior.

42. At this point, Quintner threatened that Dr. Muldoon was not permitted to see anyone else or he would end her employment with his dental practice.

43. Also, at or around this point, Quintner demanded that Dr. Muldoon cease taking the medication she was prescribed to treat her ADHD.

44. At this point, Dr. Muldoon was living in Quintner's home and had resigned from her former position without another source of income aside from her work as an employee for Quintner's business.

45. As such, Dr. Muldoon felt entrapped by Quintner, and signed the employment contract that stipulated she would be employed by the Company with Quinter as her boss, albeit with the possibility of her eventually becoming a partner.

46.    On or around September 10, 2021, Quintner proposed marriage to Dr. Muldoon.

47.    Dr. Muldoon declined Quintner's proposal.

48.    Despite Dr. Muldoon declining Quintner's proposal, Quintner offered to provide Dr. Muldoon with the engagement ring as a gift (as the ring had been designed by Dr. Muldoon's late father) provided she would agree to wear the ring.  Dr. Muldoon agreed to wear the ring, but wore the ring on her right hand.

49.    Monday, September 13, 2021, the next working day, on the way to work in the morning, Quintner demanded Dr. Muldoon wear the ring on her left hand throughout the working day and while at work.  Quintner made it clear to Dr. Muldoon that agree to act and acting as though she was engaged to him would provide workplace benefits.

50.    As a result, Dr. Muldoon hesitantly wore the ring on her left hand while at work. However, no wedding plans were ever developed and Dr. Muldoon did not intend on marrying Quintner (as Dr. Muldoon repeatedly made clear).

51.    Shortly after agreeing to act as though she were engaged to Quintner, Dr. Muldoon began facing less workplace harassment.

52.    Throughout the remainder of her employment, Quintner continued to subject Dr. Muldoon to sexual harassment, including quid pro quo sexual harassment.  For example, on many occasions, Quintner would demand Dr. Muldoon have sexual intercourse with him or perform other sexual acts with.  If Dr. Muldoon refused, Quintner would take almost immediate retaliatory actions that sought to directly reduce Dr. Muldoon's compensation.

53.    Dr. Muldoon raised protected concerns with Kelly Cerillo ("Cerillo"), practice administrator, who also performed the Company's Human Resource duties.

54.    Cerillo claimed she would hold meetings and attempt to address Dr. Muldoon's concerns.

55.    Regardless of any actions Cerillo actually took, Dr. Muldoon continued to be subjected to sexually harassing, discriminatory, and retaliatory treatment by the Defendants.

56.    Throughout this time, Quintner was becoming increasingly sexually domineering towards Dr. Muldoon in the office and at home.

57.    Indeed, his blatant sexual harassment of Dr. Muldoon intensified.

58.    Because of Quintner's continued sexual exploitation of Dr. Muldoon, Dr. Muldoon made every effort to avoid any sexual encounters with him, despite being forced to continue living in his house under threat of being terminated.

59.    Quintner's continuing discrimination, harassment, and retaliation caused Dr. Muldoon to suffer severe symptoms, including fear, loss of sleep, and severe anxiety, and caused Dr. Muldoon's post-traumatic stress disorder ("PTSD") to flare-up.

60.    Dr. Muldoon's post-traumatic stress disorder ("PTSD") is a mental impairment that substantially limits one or more of her major life activities including, but not limited to, sleeping, eating, interacting socially, and otherwise being able to control her emotions. Further, PTSD is an impairment which limits one or more of Dr. Muldoon's major bodily functions, including her neurological functions. Accordingly, at all relevant times, Dr. Muldoon's PTSD was (and still is) a disability under federal law and similar Connecticut state law, and at all relevant times Dr. Muldoon was a qualified individual with a disability.

61.    Quintner was aware of Dr. Muldoon's PTSD and used it as a means to try to psychologically manipulate Dr. Muldoon, including by threatening her.

62.     Beginning in or around early-2022, Dr. Muldoon made it clear to Quintner, that his actions and pressuring her to have sex with him, amounted to rape.

63.     Despite Dr. Muldoon making it clear to Quintner that she was not voluntarily consenting to having sex with Quintner (and, indeed, was being pressured and coerced into having sex with him due to his clear threats, including threats to fire and evict her), Quintner continued to have sex with Dr. Muldoon throughout the spring and early summer of 2022.

64.     In or around late spring 2022 and early summer 2022, as Dr. Muldoon was able to partly restore her previously depleted savings, Dr. Muldoon began more strongly resisting Quintner's sexually harassing behavior, including by refusing to have sex with him.

65.     In or around July 2022, Quintner sent Dr. Muldoon an employment contract for the next year.

66.     Shockingly, this contract did not include the promised partnership, despite Dr. Muldoon having fulfilled her obligations under the June 2021 letter of intent.

67.     Dr. Muldoon immediately raised protected concerns, including concerns Quintner was revoking the partnership track following her refusal to continue being subjected to Quintner's sexual harassment.

68.     At or around the same time, the Company stopped assigning new patients to Dr. Muldoon.

69.     Despite Dr. Muldoon's continued opposition to Quintner's sexual harassment, Quintner continued to subject Dr. Muldoon to sexual harassment at work.

70.     For example, on or around July 28, 2022, Quintner was engaged in a conversation with another employee, near a patient and Dr. Muldoon, where he (Quintner) described sexually inappropriate topics like threesomes.

71.     This conversation was highly inappropriate for the workplace and made Dr. Muldoon feel very uncomfortable.

72.     On or around July 31, 2022, Quintner threateningly shared a news story in which two dentists worked together and one started sleeping with the office manager. That dentist apparently went on a trip with his wife and murdered her, claiming it was a hunting accident.

73.     Given the nature and tone of the supposed news story, as well as the fact Quintner had demanded Dr. Muldoon go on vacation with him in the coming weeks, it seemed clear Quintner intended this to be threatening towards Dr. Muldoon.

74.     Quintner after telling this news story to Dr. Muldoon, Quintner told her that if she did not "love him" then she should find another job.

75.     Similarly, it was expressly clear by his comment that if Dr. Muldoon did not engage in a sexual relationship with Quintner, her employment with the Company would be terminated.

76.     On or around August 9, 2022, Quintner asserted to Dr. Muldoon that women make better preschool teachers than dentists.

77.     This comment was clearly discriminatory based on sex.

78.     On or around August 10, 2022, Dr. Muldoon had a meeting with Cerillo in which she raised further protected concerns of sexual harassment, including reporting the July 28, 2022 conversation about threesomes that Quintner instigated in front of a patient and Dr. Muldoon.

79.     Despite the serious nature of Dr. Muldoon's concerns, Cerillo did not meaningfully respond.

80.     That said, it seemed clear Cerillo relayed Dr. Muldoon's protected concerns to Quintner, since he immediately became increasingly angry at Dr. Muldoon.

81.     Indeed, in a clear case of retaliation, following Dr. Muldoon's expressions of these further protected concerns, Quintner began to increase his discriminatory, harassing, and retaliatory treatment of Dr. Muldoon, seemingly trying to get her to quit her job.

82.     On or around November 8, 2022, Quintner made it clear he wanted Dr. Muldoon to quit and to end her employment at the Company.

83.     In response, Dr. Muldoon told Quintner that she was not agreeing to quit.  In addition, Dr. Muldoon raised further protected concerns, including concerns that he had altered the business arrangement in clear retaliation for Dr. Muldoon not going along with his quid pro quo sexual harassment and for raising protected concerns.

84.     Indeed, Dr. Muldoon raised concerns that it appeared Quintner was saying he would not work with her unless she was having sex with him.

85.     On or around November 10, 2022, Quinter began verbally abusing Dr. Muldoon, screaming at her and physically threatening Dr. Muldoon by not giving her any space.  Indeed, Quintner berated Dr. Muldoon again, attempting to get her to say she was quitting her employment.

86.     In response, Dr. Muldoon again made it clear she would continue to work under the terms of the original partnership agreement, so long as Quintner ceased his sexual harassment of her (Dr. Muldoon).

87.     Around this time, Dr. Muldoon also discovered that Quintner had been attempting to break into her cell phone and had locked Dr. Muldoon out of it, requiring a hard reset by a cellular carrier.

88.     Also throughout this time, Quintner went into frequent rages due to Dr. Muldoon's ending of the relationship. Indeed, he asserted he would stop scheduling patients with Dr. Muldoon as of January 1, 2023.

89.     Thus, it was clear that Dr. Muldoon was being terminated.

90.     Quintner was so enraged about losing control of Dr. Muldoon that he attempted to hold Dr. Muldoon hostage in his home.

91.     Indeed, on or around November 18, 2022, Quintner was arrested for unlawful restraint against Dr. Muldoon.

92.     On or around November 22, 2022, having been told by Quintner that Dr. Muldoon was going to be effectively terminated by January 1, 2023, Dr. Muldoon agreed to fulfill her professional obligations regarding her remaining cases.

93.     Even though Quintner had been arrested for unlawful restraint against Dr. Muldoon, Dr. Muldoon did not want to leave her patients untreated, and thus worked on or around November 23, 2022 in the Company's office.

94.     On or around November 29, 2022, Dr. Muldoon found her entire schedule had been cleared and rebooked with different dentists.

95.     When Dr. Muldoon arrived to the office that day, a lawyer for the Company explicitly told Dr. Muldoon that she was fired and if she returned to the office, she would be trespassing.

96.     Thus, Dr. Muldoon was involuntarily terminated from the Company on or around November 29, 2022.

97.     On or around April 3, 2023, Dr. Muldoon timely filed a Charge of Discrimination (the "Charge") (case number 2330469) with the Connecticut Commission on Human Rights and

Opportunities (the "CHRO") and cross-filed with the Equal Employment Opportunity Commission (the "EEOC").

98.    On or around December 9, 2024, Dr. Muldoon notified the CHRO and EEOC of her intent to file the Complaint in Court and requested the appropriate releases of jurisdiction.

99.    On or around December 11, 2024, the CHRO provided a release of jurisdiction allowing Dr. Muldoon to proceed in court.

100.    On or around March 4, 2025, the EEOC provided a Right to Sue letter allowing Dr. Muldoon to proceed in court.

101.    This lawsuit is timely filed.

## COUNT I

**(Unlawful Sex Discrimination and Sexual Harassment in Violation of Conn. Gen. Stat. 46a-60)**

**Plaintiff v. Defendants (the Company and Quintner)**

102.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

103.    The Company is an employer under the definitions applicable to Conn. Gen. Stat. § 46a-60 because the Company employed three or more persons.

104.    The Defendants, by and through its agents, sexually harassed, otherwise harassed, and discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because the Plaintiff was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment sexually harassing behavior.

105.    More specifically, in whole or in part because the Plaintiff was a woman and/or a woman who refused to accept, engage in, or reciprocate sexual harassment, the Defendants subjected the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

106.    The Defendants' improper actions included the creation and perpetuation of a *quid pro quo* sexually harassing workplace culture in which the Plaintiff was denied favorable treatment unless she was willing to accept or reciprocate the flirtation, sexual attention, and harassing treatment of Quintner.  The Company and Quintner also subjected Plaintiff to a sexually harassing hostile work environment.

107.    Quintner aided and abetted in Defendants' discriminatory actions, intended to discriminate against and/or retaliate against and/or coerce, intimidate, threaten, and/or interfere with Dr. Muldoon's exercising of, or enjoyment of, one or more rights granted by Connecticut law, and/or knew of his role in an enterprise designed to deprive Dr. Muldoon of the rights guaranteed to her under Connecticut law.

108.    The Defendants acted with malice and/or with reckless indifference to the state protected rights of the Plaintiff.

109.    As a direct and proximate result of the Defendants' violations of Connecticut state law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

110.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT II

**(Unlawful Sex Discrimination and Sexual Harassment in Violation of Title VII)**

**Plaintiff v. the Company**

111.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

112.    During all relevant periods the Company was an employer under Title VII, 42 U.S.C. §§ 2000e, et seq. (hereinafter, "Title VII") because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

113.    The Company, by and through its agents, sexually harassed, otherwise harassed, and discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because the Plaintiff was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment sexually harassing behavior.

114.    More specifically, in whole or in part because the Plaintiff was a woman and/or a woman who refused to accept, engage in, or reciprocate sexual harassment, the Company subjected the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing

work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

115.    The Company's improper actions included the creation and perpetuation of a *quid pro quo* sexually harassing workplace culture in which the Plaintiff was denied favorable treatment unless she was willing to accept or reciprocate the flirtation, sexual attention, and harassing treatment of Quintner.  The Company and Quintner also subjected Plaintiff to a sexually harassing hostile work environment.

116.    The Company acted with malice and/or with reckless indifference to the federally protected rights of the Plaintiff.

117.    As a direct and proximate result of the Company's violations of Title VII, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

118.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

**COUNT III**

**(Disability Discrimination in Violation of Conn. Gen. Stat. 46a-60)**

**Plaintiff v. Defendants (the Company and Quintner)**

119.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

120.    The Plaintiff suffers (and at all relevant times suffered) from disabilities, including, post-traumatic stress disorder ("PTSD") and ADHD.  Plaintiff's PTSD and ADHD are impairments that substantially limit one or more of her major life activities, including, but not limited to, concentrating, sleeping, and driving.  The Plaintiff's PTSD and ADHD are also an impairment that further substantially limit the operation of one or more of the Plaintiff's major bodily functions, including, but not limited to, her neurological functions. Accordingly, the Plaintiff's PTSD and ADHD are and at all were relevant times was a disability under Connecticut law and the Plaintiff was (and is) disabled under the same.

121.    At all relevant times, the Plaintiff was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

122.    The Plaintiff disclosed her disabilities to the Defendants, and/or the Defendants was aware of the Plaintiff's disabilities, and/or the Defendants regarded the Plaintiff as disabled.

123.    The Plaintiff requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, having time off from work for treatment of her disabilities.

124.    The disability-related accommodations requested by the Plaintiff did not pose an undue burden on the Defendants.

125.    The Defendants failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

126. The Defendants unlawfully denied, and/or eventually revoked, one or more of the Plaintiff's disability-related accommodation requests.

127. Quintner aided and abetted in Defendants' discriminatory actions, intended to discriminate against and/or retaliate against and/or coerce, intimidate, threaten, and/or interfere with Dr. Muldoon's exercising of, or enjoyment of, one or more rights granted by Connecticut law, and/or knew of his role in an enterprise designed to deprive Dr. Muldoon of the rights guaranteed to her under Connecticut law.

128. The Defendants discriminated against the Plaintiff due to her disabilities by subjecting the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

129. Non-disabled employees of the Defendants were treated more favorably than the Plaintiff including through not being improperly harassed, criticized, and/or not being terminated.

130. Upon information and belief, the Defendants replaced the Plaintiff with a lesser or similarly qualified, non-disabled employee.

131. The Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of the Plaintiff and/or conduct so reckless to amount to such disregard.

132. As a direct and proximate result of the Defendants' violations of Connecticut law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

133.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT IV

### (Disability Discrimination in Violation of the ADA)

### Plaintiff v. the Company

134.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

135.    During all relevant times, the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

136.    The Plaintiff suffers (and at all relevant times suffered) from disabilities, including, post-traumatic stress disorder ("PTSD") and ADHD.  Plaintiff's PTSD and ADHD are impairments that substantially limit one or more of her major life activities, including, but not limited to, concentrating, sleeping, and driving.  The Plaintiff's PTSD and ADHD are also an impairment that further substantially limit the operation of one or more of the Plaintiff's major bodily functions, including, but not limited to, her neurological functions. Accordingly, the

Plaintiff's PTSD and ADHD are and at all were relevant times was a disability under federal law and the Plaintiff was (and is) disabled under the same.

137.    At all relevant times, the Plaintiff was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

138.    The Plaintiff disclosed her disabilities to the Company, and/or the Company was aware of the Plaintiff's disabilities, and/or the Company regarded the Plaintiff as disabled.

139.    The Plaintiff requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, having time off from work for treatment of her disabilities.

140.    The disability-related accommodations requested by the Plaintiff did not pose an undue burden on the Company.

141.    The Company failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

142.    The Company unlawfully denied, and/or eventually revoked, one or more of the Plaintiff's disability-related accommodation requests.

143.    The Company discriminated against the Plaintiff due to her disabilities by subjecting the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

144. Non-disabled employees of the Company were treated more favorably than the Plaintiff including through not being improperly harassed, criticized, and/or not being terminated.

145. Upon information and belief, the Company replaced the Plaintiff with a lesser or similarly qualified, non-disabled employee.

146. The Company acted with malice and/or with reckless indifference to the federally protected rights of the Plaintiff.

147. As a direct and proximate result of the Company's violations of Connecticut law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

148. The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT V

### (Retaliation in Violation of Conn. Gen. Stat. 46a-60)

### Plaintiff v. Defendants (the Company and Quintner)

149. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

150.    The Plaintiff engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by (i) requesting and utilizing accommodations related to her disabilities and (ii) opposing, and raising concerns regarding, the sexually harassing, otherwise harassing, discriminatory, and retaliatory actions of the Company, Quintner, and the Company's employees and/or by expressing protected concerns regarding the Company's failure to adequately investigate and/or failure to take measures to appropriately address, and/or inappropriate response related to the Plaintiff's expression of protected harassment, discrimination, and retaliation concerns.

151.    The Defendants retaliated against the Plaintiff and/or discriminated against the Plaintiff for opposing one or more acts or practices made unlawful by Conn. Gen. Stat. § 46a-60, including by subjecting the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

152.    Quintner aided and abetted in Defendants' discriminatory actions, intended to discriminate against and/or retaliate against and/or coerce, intimidate, threaten, and/or interfere with Dr. Muldoon's exercising of, or enjoyment of, one or more rights granted by Connecticut law, and/or knew of his role in an enterprise designed to deprive Dr. Muldoon of the rights guaranteed to her under Connecticut law.

153.    The Defendants' actions against the Plaintiff were willful and malicious.

154.    As a direct and proximate result of the Defendants' violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to,

lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

155.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT VI

### (Retaliation Under Title VII)

### Plaintiff v. the Company

156.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

157.    The Plaintiff engaged in protected activity under Title VII, including, but not limited to, raising concerns regarding the sexually harassing, otherwise harassing, discriminatory, and retaliatory actions of the Company and its employees and/or by expressing protected concerns regarding the Company's failure to adequately investigate and/or failure to take measures to appropriately address, and/or inappropriate response related to the Plaintiff's expression of protected harassment, discrimination, and retaliation concerns.

158.    The Company retaliated against the Plaintiff and/or discriminated against the Plaintiff for opposing one or more acts or practices made unlawful by Title VII, including by subjecting the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing

work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

159. The Company's actions against the Plaintiff were willful and malicious and were in intentional, conscious, or reckless disregard to Plaintiff's federally protected rights.

160. As a direct and proximate result of the Company's violations of Title VII, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

161. The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT VII

### (Retaliation Under the ADA)

### Plaintiff v. the Company

162. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

163. The Plaintiff engaged in protected activity under the ADA, including, but not limited to, by (i) requesting accommodations related to her disabilities and/or (ii) raising

concerns regarding the discriminatory and retaliatory actions of the Company and its employees and/or by expressing protected concerns regarding the Company's failure to adequately investigate and/or failure to take measures to appropriately address, and/or inappropriate response related to the Plaintiff's expression of protected harassment, discrimination, and retaliation concerns.

164.    The Company retaliated against the Plaintiff and/or discriminated against the Plaintiff for opposing one or more acts or practices made unlawful by the ADA, including by subjecting the Plaintiff to adverse actions, including, but not limited to, a hostile and harassing work environment, the revocation of prior agreements (such as the partnership agreement), a demotion, the refusal to schedule patients, a decrease in her earnings, and the termination of the Plaintiff's employment.

165.    The Company's actions against the Plaintiff were willful and malicious and/or done with a conscious disregard and/or reckless indifference to the Plaintiff's federally protected rights.

166.    As a direct and proximate result of the Company's violations of the ADA, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

167.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT VIII

### (Intentional Sexual Assault and Battery)

### Dr. Muldoon v. Quintner

168.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

169.    As pled above in greater particularity, Quinter intended to cause and, in fact, did cause, one or more harmful offensive contacts and subjected Dr. Muldoon to such contact.

170.    Indeed, although Dr. Muldoon made it clear she was unwilling to engage in sexual relations with Quintner, Quintner used his position as Dr. Muldoon's employer and landlord, to pressure Dr. Muldoon into engaging in sexual relations with him.

171.    As a direct and proximate result of Quintner's actions, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

172.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT IX

### (False Imprisonment)

### Dr. Muldoon v. Quintner

173. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

174. As pled above in greater particularity, Quintner intentionally restrained Dr. Muldoon in a confined area without Dr. Muldoon's consent, including on or around November 18, 2022 when Quintner intentionally restrained Dr. Muldoon by forcibly throwing her in his car, shutting the door, and beginning to drive away with Dr. Muldoon in the car.

175. Dr. Muldoon was aware of the confinement.

176. Quintner did not have any legal justification for restraining Dr. Muldoon, nor did Quintner have the legal authority to restrain Dr. Muldoon.

177. As a direct and proximate result of Quintner's actions, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

178. The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

**COUNT X**

**(Intentional Infliction of Emotional Distress)**

**Dr. Muldoon v. Quintner**

179.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

180.    Quintner engaged in a series of actions with the intent to inflict emotional distress and/or he knew or should have known that emotional distress was the likely result of his conduct, including, but not limited to, by subjecting Dr. Muldoon to continuous sexual harassment and sexual assault over the course of more than a year.

181.    This conduct was extreme and outrageous.

182.    As a result of Quintner's actions, Dr. Muldoon suffered from severe emotional distress, including suffering from worsening PTSD, loss of sleep, weight gain, mental anguish, and other severe emotional distress.

183.    Quinter's actions were the cause of Dr. Muldoon's severe emotional distress.

184.    As a direct and proximate result of Quintner's actions, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

185.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT XI

### (Breach of Contract – Partnership)

### Dr. Muldoon v. the Company and Quintner

186.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

187.    Defendants Quintner and the Company agreed to partner with Dr. Muldoon and agreed that Dr. Muldoon would be made a partner at the Company provided Dr. Muldoon performed work for the Company and engaged in business with the Company.

188.    Dr. Muldoon performed her obligations under the contract.

189.    Despite Dr. Muldoon's performance of her obligations under the contract, the Defendants failed to perform their obligations under the contract and, instead, refused to enter into a partnership agreement with Dr. Muldoon and terminated her employment.

190.    As a direct and proximate result of the Defendants' breach of the contract, Dr. Muldoon has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

191.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages, attorneys' fees, interest, and costs.

## COUNT XII

### (Promissory Estoppel)

### Dr. Muldoon v. the Company and Quintner

192.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

193.    Defendants Quintner and the Company promised to enter into a partnership agreement with Dr. Muldoon whereby Dr. Muldoon would become a partner and/or co-owner in the Company.

194.    Defendants Quintner and the Company repeatedly promised to enter into this agreement with Dr. Muldoon, but repeatedly delayed and/or deferred this promise, including by asserting they had not had time to write the formal contract (which had been set forth in the letter of intent, as well as conveyed verbally and accepted verbally).

195.    Based on their promises, Defendants Quintner and the Company reasonably expected to induce Dr. Muldoon to enter their employ, to perform work for them, and to engage in business with them.

196.    Dr. Muldoon did rely on Defendants Quintner and the Company's promises in entering employment, continuing employment, and engaging in business with the Company.

197.    Injustice can only be avoided by enforcing Defendants Quinter and the Company's promises.

198.    As a direct and proximate result of the Defendants' actions, Dr. Muldoon has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

199.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages, attorneys' fees, interest, and costs.

WHEREFORE, the Plaintiff, Catherine Muldoon, respectfully requests that this honorable court:

A. Schedule this matter for trial by jury;

B. Find the Defendant liable on all counts;

C. Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay),

D. Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E. Award the Plaintiff emotional distress damages and compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

F. Award the Plaintiff punitive damages;

G. Award the Plaintiff her reasonable attorneys' fees;

H. Award the Plaintiff interest and costs;

I. Award the Plaintiff all other damages to which she is entitled; and

J. Grant such further relief as is just and equitable.

Respectfully Submitted,

CATHERINE MULDOON

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date: June 23, 2025                    By:   /s/ Michael R. Varraso
                                             Michael R. Varraso
                                             mvarraso@wyattlegalservices.com
                                             CT State Bar: 439521
                                             D. Conn. No.: ct307777

                                             Benjamin J. Wyatt
                                             BWyatt@Wyattlegalservices.com
                                             CT State Bar: 437487
                                             D. Conn. No.: ct29994

                                             The Law Offices of Wyatt & Associates,
                                             P.L.L.C.
                                             17 Elm Street, Suite C211
                                             Keene, NH 03431
                                             Telephone: (603) 357-1111
                                             Facsimile: (603) 685-2868